# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEPHEN BALDASSANO, individually and on behalf of all others similarly situated,<br><br>　　　　　　　*Plaintiff*,<br><br>　　v.<br><br>KNORR-BREMSE AG; KNORR BRAKE COMPANY; NEW YORK AIR BRAKE COMPANY; WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION; and FAIVELEY TRANSPORT NORTH AMERICA INC.<br><br>　　　　　*Defendants*. | Case No.<br><br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Stephen Baldassano, individually and on behalf of a class of all those similarly situated (the "Class"), brings this civil antitrust action against Defendants Knorr-Bremse AG, Knorr Brake Company, New York Air Brake Company, Westinghouse Air Brake Technologies Corporation, and Faiveley Transport North America Inc. (collectively, "Defendants"), and alleges based on personal knowledge, the investigation of his counsel, and on information and belief, the following:

## NATURE OF ACTION

1.　　　This class action challenges under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3 unlawful agreements between and among three of the world's largest rail equipment suppliers to restrain competition in the labor market in which they compete for employees.

2.　　　During the Class Period (defined herein), Defendants Knorr-Bremse AG ("Knorr") and Westinghouse Air Brake Technologies Corporation ("Wabtec") and Faiveley Transport S.A., prior to its acquisition by Wabtec in November 2016, collectively agreed not to solicit, recruit, or

hire each other's employees without prior approval, or otherwise compete for employees (collectively, "No-Poach Agreements").

3.    The conspiratorial No-Poach Agreements had the effect of unlawfully allocating employees among Defendants, resulting in suppressed compensation, among other injuries, to U.S. workers. Despite the high demand for a limited supply of skilled employees who have the relevant technical and industry experience, the unlawful No-Poach Agreements substantially limited U.S. rail industry workers' access to better job opportunities, restricted mobility, and deprived them of information useful in negotiating better terms of employment, including higher compensation.

4.    On April 3, 2017, the Antitrust Division of the United States Department of Justice (the "DOJ") announced that, while investigating the Faiveley Transport S.A. – Wabtec merger, it discovered the No-Poach Agreements. The DOJ reached a settlement with Knorr and Wabtec, resolving charges that they unlawfully agreed to restrain competition in the labor market in which they compete for employees, a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[1] However, the DOJ confirmed that it would not seek restitution on behalf of employees who were injured by Defendants' No-Poach Agreements, meaning that employees have obtained no compensation for their injuries.[2]

## JURISDICTION AND VENUE

5.    Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover damages suffered by Plaintiff and the Class and to secure equitable and injunctive relief against Defendants for violating Sections 1 and 3 of the Sherman Act (15 U.S.C.

---

[1] *See U.S. v. Knorr-Bremse AG and Westinghouse Air Brake Technologies Corp., Case No. 18-cv-00747 (D.D.C.)., Document 3, Competitive Impact Statement,* Apr. 3, 2018, *available at* https://www.justice.gov/opa/press-release/file/1048481/download (viewed Apr. 20, 2018).
[2] *Id.* at 17.

§§ 1, 3). Plaintiff and the Class also seek attorneys' fees, costs, and other expenses under federal law.

6.      This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) and 28 U.S.C. §§ 1331 and 1337.

7.      Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants reside, are doing business in, or transact business in this District.

8.      Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their substantial contacts with the Commonwealth of Pennsylvania, including contacts in furtherance of the conspiracy alleged herein.

9.      Defendants, directly or through their agents, subsidiaries, affiliates, or parents may be found in and transact business in the forum state.

10.     Defendants, directly or through their agents, engage in interstate commerce in the production, distribution, and sale of rail equipment and services related thereto in the United States.

## PARTIES

### A. **Plaintiff**

11.     Plaintiff Stephen Baldassano, is a resident of Randallstown, Maryland. Plaintiff worked for Knorr Brake Company during the Class Period. As a result of the conspiracy as alleged herein, Plaintiff earned less compensation than he would have earned absent the alleged conspiracy.

B. **Defendants**

12.    Defendant Knorr-Bremse AG ("Knorr") is a privately-owned German company with its headquarters in Munich, Germany. Knorr is a global leader in the development, manufacture, and sale of equipment for rail and commercial vehicle systems. In 2017, Knorr had annual revenues of approximately $7.7 billion.[3]

13.    Defendant Knorr Brake Company is a wholly-owned subsidiary of Knorr incorporated in Delaware with its headquarters in Westminster, Maryland. It manufactures HVAC, braking, and door systems used on passenger rail vehicles.

14.    Defendant New York Air Brake Corporation is a wholly-owned subsidiary of Knorr incorporated in Delaware with its headquarters in Watertown, New York. It manufactures railway air brakes and other rail equipment used on freight trains.

15.    Defendant Westinghouse Air Brake Technologies Corporation ("Wabtec") is a Delaware corporation with its headquarters in Wilmerding, Pennsylvania. Wabtec is a publicly-held company, listed on the New York Stock Exchange. With over 100 subsidiaries globally, Wabtec is the world's largest provider of rail equipment and services with global sales of $3.9 billion in 2017.[4] It is an industry leader in the freight and passenger rail segments of the rail equipment industry. Westinghouse Air Brake Technologies Corporation Passenger Transit is a

---

[3] *See Knorr-Bremse posts record sales of EUR 6.24 bn in fiscal 2017*, KNORR-BREMSE GROUP, Feb. 7, 2018, *available at* http://www.knorr-bremse.de/en/press/pressreleases/press_detail_39680.jsp (viewed Apr. 21, 2018).

[4] *See Wabtec Reports Results for 2017 4Q and Full Year, Issues 2018 Financial Guidance*, WABTEC CORPORATION, Feb. 20, 2018, *available at* https://www.wabtec.com/press-releases/8499/wabtec-reports-results-2017-4q-and-full-year-issues-2018-financial-guidance (viewed Apr. 22, 2018).

business unit of Wabtec that develops, manufactures, and sells rail equipment and services for passenger rail applications. It is based in Spartanburg, South Carolina.

16.    Defendant Faiveley Transport North America ("Faiveley"), formerly a subsidiary of Faiveley Transport S.A., is now a wholly owned subsidiary of Wabtec, and is a New York corporation headquartered in Greenville, South Carolina. On November 30, 2016, Wabtec acquired Faiveley Transport S.A., which had been a "French société anonyme" (French public limited company) based in Gennevilliers, France. Prior to the acquisition, Faiveley Transport S.A. was the world's third-largest rail equipment supplier behind Wabtec and Knorr. Faiveley Transport S.A. had employees in 24 countries, including at six U.S. locations. It developed, manufactured, and sold passenger and freight rail equipment to customers in Europe, Asia, and North America, including the United States, with revenues of approximately $1.2 billion in 2016.[5] In the United States, Faiveley Transport S.A. conducted business primarily through Defendant Faiveley. Various Faiveley recruiting activities conducted prior to its acquisition by Wabtec are at issue in this complaint.

## FACTUAL ALLEGATIONS

### A.  The No-Poach Conspiracy.

17.    Beginning almost a decade ago, Wabtec, Knorr, and Faiveley entered into No-Poach Agreements wherein they conspired with each other to eliminate competition between themselves for employees. These agreements were executed and enforced by senior company executives and implemented throughout the companies' U.S. subsidiaries. The No-Poach Agreements were not reasonably necessary to any separate, legitimate business transaction or

---

[5] *See Form 10-K Westinghouse Air Brake Technologies Corporation*, UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Dec. 31, 2016, *available at* https://www.sec.gov/Archives/edgar/data/943452/000162828017001863/wab1231201610k.htm (viewed Apr. 22, 2018).

legitimate collaboration between the companies and disrupted the normal bargaining and price-setting mechanisms that apply in the labor market.

### (i)    The Wabtec-Knorr Agreement.

18.    Beginning no later than 2009, Wabtec's and Knorr Brake Company's most senior executives entered into an express No-Poach Agreement and thereafter actively managed that agreement through direct communications. For example, in a letter dated January 28, 2009, a director of Knorr Brake Company wrote to a senior executive at Wabtec's headquarters, "[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent case for both companies. As you so accurately put it, 'we compete in the market.'"[6] This agreement was known to senior executives at Knorr and Wabtec, including top Knorr executives in Germany, who were included in key communications regarding the No-Poach Agreement.[7] In furtherance of their agreement, Wabtec and Knorr Brake Company informed their outside recruiters not to solicit employees from the other company.[8]

19.    Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' No-Poach Agreement. For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who had solicited a Knorr Brake Company employee for an opening at Wabtec. The Wabtec executive investigated the matter internally and reported back to Knorr that he had instructed the recruiter to

---

[6] *See Justice Department Requires Knorr and Wabtec to Terminate Unlawful Agreement Not to Compete for Employees*, DEPARTMENT OF JUSTICE OFFICE OF PUBLIC AFFAIRS, Apr. 3, 2018, *available at* https://www.justice.gov/opa/pr/justice-department-requires-knorr-and-wabtec-terminate-unlawful-agreements-not-compete (viewed Apr. 20, 2018).
[7] *See U.S. v. Knorr-Bremse AG and Westinghouse Air Brake Technologies Corp*., Case No. 18-cv-00747 (D. D.C.)., Document 3, Competitive Impact Statement, Apr. 3, 2018, *available at* https://www.justice.gov/opa/press-release/file/1048481/download (viewed Apr. 20, 2018) at 6.
[8] *Id.*

terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing No-Poach Agreement between the companies.

20.    According to a 2010 internal communication, the No-Poach Agreement even foreclosed the consideration of unsolicited applicants employed by Wabtec or Knorr Brake Company without prior approval of the other firm.[9] Specifically, a senior executive at Knorr Brake Company stated that he would not even consider a Wabtec candidate who applied to Knorr Brake Company without the permission of his counterpart at Wabtec.[10]

21.    Moreover, Wabtec and Knorr's No-Poach Agreement also reached the companies' U.S. rail equipment businesses. In July 2012, for example, a senior executive at New York Air Brake Corporation informed a human resources manager that he could not consider a Wabtec employee for a job opening due to the No-Poach Agreement between Wabtec and Knorr.

### (ii)    The Knorr-Faiveley Agreement.

22.    Beginning no later than 2011, senior executives at Knorr Brake Company and Faiveley Transport North America reached an express No-Poach Agreement that involved commitments to contact one another before pursuing an employee of the other company.[11] In October 2011, a senior executive at Knorr Brake Company explained in an e-mail to a high-level executive at Knorr that he had a discussion with an executive at Faiveley that "resulted in an agreement between us that we do not poach each other's employees. We agreed to talk if there was one trying to get a job."[12]

---

[9] *United States v. Knorr-Bremse AG, et al.*, Case No 1:18-cv-00747, Document 1, Complaint, (D.D.C. Apr. 3, 2018) at 7-8.
[10] *Id.* at 8.
[11] *Id.*
[12] *Id.* at 8-9.

23.    In or about 2012, a senior executive at Knorr Brake Company discussed the companies' No-Poach Agreement with an executive at Faiveley at a trade show in Berlin, Germany.[13] Subsequently, senior executives at the companies enforced the No-Poach Agreement through direct communications with each other. For example, in October 2012, executives at Faiveley stated in an internal communication that they were required to contact Knorr Brake Company before hiring a U.S. train brake engineer.[14]

24.    The companies continued their No-Poach Agreement until at least 2015. After Wabtec announced its proposed acquisition of Faiveley Transport S.A. in July 2015, a high-level Knorr executive directed the company's recruiters in the United States and other jurisdictions to raid Faiveley for high-potential employees, temporarily "cheating" on the No-Poach Agreement.[15]

### (iii)    The Wabtec-Faiveley Agreement.

25.    Beginning no later than January 2014, senior executives at Wabtec Passenger Transit and Faiveley entered into a No-Poach Agreement in which the companies agreed not to hire each other's employees without prior notification to and approval from the other company.[16] Wabtec Passenger Transit and Faiveley executives actively managed and enforced the agreement. For example, in January 2014, Wabtec Passenger Transit executives refused to engage in hiring discussions with a U.S.-based project manager at Faiveley without first getting permission from Faiveley executives.[17] In an internal e-mail to his colleagues, a Wabtec Passenger Transit executive explained that the candidate "is a good guy, but I don't want to violate my own agreement with

---

[13] *Id.* at 9.
[14] *United States v. Knorr-Bremse AG, et al.*, Case No 1:18-cv-00747, Document 1, Complaint, (D.D.C. Apr. 3, 2018) at 9.
[15] *Id.*
[16] *Id.*
[17] *Id.* at 10.

[Faiveley]."[18] One month later, a Wabtec Passenger Transit senior executive informed his staff that hiring Faiveley's employees was "off the table" due to the agreement with Faiveley.

26.     In July 2015, Wabtec and Faiveley Transport S.A. publicly announced their intent to merge. Wabtec closed its acquisition of Faiveley Transport S.A. on November 30, 2016. Presently, Faiveley is a wholly-owned subsidiary of Wabtec.

### (iv)     The Investigation by the Antitrust Division of the United States Department of Justice.

27.     On January 19, 2018, the head of the Antitrust Division of the DOJ, Assistant Attorney General ("AAG") Makan Delrahim, announced that the DOJ would bring its first criminal cases involving alleged no-poaching agreements in violation of the Sherman Act in the coming months and warned that if such activity "has not been stopped and continued from the time when the DOJ's [new no-poaching] policy was made" in October 2016, the DOJ would "treat that [conduct] as criminal."[19]

28.     Following the October 2016 policy announcement, the DOJ and the Federal Trade Commission (the "FTC") jointly issued the Antitrust Guidance for Human Resource Professionals (the "Antitrust HR Guidance"), which acknowledged that the DOJ would "proceed criminally against naked wage-fixing or no-poaching agreements" and that "[n]aked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws. That means that if the agreement is separate

---

[18] *Id.*

[19] *See* M. Perlman, *Delrahim Says No-Poach Cases Are In The Works*, Law360, Jan. 19, 2018, *available at* https://www.law360.com/articles/1003788/delrahim-says-criminal-no-poach-cases-are-in-the-works (viewed Apr. 20, 2018).

from or not reasonably necessary to a larger legitimate collaboration between the employers, the agreement is deemed illegal without any inquiry into its competitive effects."[20]

29.    In July 2015, Wabtec announced its intent to acquire Faiveley. During its review of the Wabtec-Faiveley merger, the Antitrust Division of the DOJ detected the No-Poach Agreements between the companies. A separate investigation was thereafter launched and on April 3, 2018, the DOJ filed a complaint in federal court against Defendants Knorr and Wabtec.[21]

30.    The DOJ found that the companies' agreements unlawfully allocated employees between the companies, "disrupted the normal bargaining and price-setting mechanisms that apply in the labor market," and were *per se* illegal under the Sherman Act. The DOJ also concluded that Defendants' agreements "were naked restraints on competition for employees and were not reasonably necessary to any separate legitimate business transaction or collaboration between the firms." The DOJ emphasized that the settlement agreement with Defendants covered a restraint on soliciting, recruiting, hiring without approval, or otherwise competing for various employees, including "project managers, engineers, executives, business unit heads, and corporate officers." This restraint deprived workers of "competitively important information that they could have leveraged to bargain for better job opportunities in terms of employment."

31.    On April 3, 2018, the DOJ announced its settlement with Knorr and Wabtec after discovering that the companies "had for years maintained unlawful agreements not to compete with each other's employees." In connection with its settlement announcement, AAG Delrahim

---

[20] *See* Antitrust Guidance for Human Resource Professionals, DEPARTMENT OF JUSTICE ANTITRUST DIVISION, FEDERAL TRADE COMMISSION, Oct. 2016, *available at* https://www.justice.gov/atr/file/903511/download (viewed Apr. 20, 2018).
[21] *U.S. v. Knorr-Bremse AG and Westinghouse Air Brake Technologies Corp.*, Case No. 18-cv-00747 (D. D.C., Apr. 3, 2018).

stated that "[t]oday's complaint is part of a broader investigation by the Antitrust Division into naked agreements not to compete for employees—generally referred to as no-poach agreements."

32.     Under the terms of the settlement, Wabtec and Knorr are "prohibited from entering, maintaining, or enforcing No-Poach Agreements with any other companies" going forward. The proposed stipulation and order by the DOJ covers both parent companies Wabtec and Knorr, and their successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, joint ventures, directors, officers, managers, agents, and employees.

33.     The DOJ noted that it "pursued the agreements at issue in the Complaint by civil action rather than as a criminal prosecution because the United States uncovered and began investigating the agreements, and the Defendants terminated them before the United States had announced its intent to proceed criminally against such agreements."

**B.  The Railway Industry Labor Market.**

34.     According to the Bureau of Labor Statistics, the number of railway worker jobs in 2017 in the U.S. was approximately 106,000.[22] The table below breaks down the number of workers employed in the each respective railway occupation.[23]

| Data series | Employment, 2017 |
|---|---|
| Locomotive engineers | 34,070 |
| Rail car repairers | 13,310 |
| Rail-track laying and maintenance equipment operators | 7,690 |
| Railroad brake, signal, and switch operators | 11,820 |
| Railroad conductors and yardmasters | 39,590 |

---

[22] *See* Bureau of Labor Statistics, *Industries at a Glance: rail Transportation*, UNITED STATES DEPARTMENT OF LABOR, *available at* https://www.bls.gov/iag/tgs/iag482.htm (viewed Apr. 22, 2018).
[23] *Id.*

35.     As of the filing of this Complaint, Wabtec employed approximately 18,000 full-time employees worldwide,[24] and acquired approximately 5,700 employees in 24 countries from its acquisition of Faiveley.[25] As of December 31, 2016, Knorr employed approximately 25,000 employees worldwide.[26]

36.     In a competitive labor market, Defendants and their subsidiaries would compete with one another, as well as with firms at other tiers of the rail industry supply chain, to attract, hire, and retain skilled employees by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment. Firms in the rail equipment industry employ a plethora of recruiting techniques, including using internal and external recruiters to identify, solicit, and otherwise assist in hiring potential employees.

37.     However, directly soliciting employees from another rail equipment industry participant is a particularly efficient and effective method of competing for qualified employees because those individuals likely already have the specialized skills necessary for the role. Specifically, through poaching, a company is able to save costs and avoid risks by taking advantage of the efforts its rival has expended in soliciting, interviewing, and training employees, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend. Thus, if each Defendant was truly acting in its own independent self-interest, it would solicit the others' employees, including through offers of increased employment benefits and pay.

---

[24] *See Fast Facts*, WABTEC CORPORATION, *available at* https://www.wabtec.com/fast-facts (viewed Apr. 22, 2018).

[25] *See Wabtec Plans to Acquire Faiveley Transport*, WABTEC CORPORATION, Jul. 27, 2015, *available at* https://www.wabtec.com/press-releases/5743/wabtec-plans-acquire-faiveley-transport (viewed Apr. 22, 2018).

[26] *See Connected: Facts and Figures*, KNORR-BREMSE, Dec. 31, 2016, *available at* http://www.knorr-bremse.com/media/documents/press/publications_1/facts_figures/FirstSpirit_1490596240594FF_EN_2016_V8.pdf (viewed Apr. 22, 2018).

38.    This competition in turn benefits employees because it increases the available job opportunities that employees learn about. It also improves an employee's ability to negotiate for a better salary, benefits, and other terms of employment.

## PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

39.    Defendants' conspiracy intended to and did suppress Plaintiff's and the Class' compensation and restricted competition in the labor market in which Plaintiff and the other Class members sold their services. It did so through a scheme that eliminated solicitation, a significant form of competition to attract skilled labor in the U.S. rail industry.

40.    Solicitation has a significant beneficial impact for individual employees' compensation. Specifically, solicitation from rival employers may include offers that exceed an employee's salary, allowing them to receive a higher salary by either changing employers or negotiating increased compensation from the current employer. Employees solicited from other industry players may also inform other employees of the offer they received, spreading information about higher salary levels that can similarly lead to movement or negotiation by those other employees with their current employer or others.

41.    Active solicitation similarly affects compensation practices by employers. A firm that solicits competitors' employees will learn whether their offered compensation is enough to attract their competitors' employees, and may increase the offer to make themselves more competitive. Similarly, through solicitation, companies would be privy to information indicating whether their offered compensation is enough to keep their current employees and may cause employers to preemptively increase their employees' compensation in order to reduce their competitors' appeal.

42.    Information about higher salaries and benefits provided by recruiters for one firm to employees of another naturally would increase employee compensation. Restraining active

recruitment made higher paying opportunities less transparent to workers and thus allowed employers to keep salaries artificially suppressed. This anticompetitive behavior did not just affect particular individuals who would have been solicited, but all workers and Class members employed by the Defendants.

43.     Labor competition in the rail and freight industry is nationwide. Defendants considered each other's compensation packages to be competitively relevant regardless of location, and many Class members may have moved between states to pursue employment opportunities.

44.     Therefore, Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust industry throughout the United States.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action on behalf of himself and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3). The Class is defined as follows:

> All persons employed by Defendants or their wholly-owned subsidiaries at any time from 2009 to the present. Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of the Defendants and employees hired outside of the United States to work outside of the United States. The "United States" includes all fifty states, the District of Columbia, and all U.S. territories.

46.     While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the Class contains hundreds, if not thousands, of members, as each Defendant employed hundreds or thousands of employees each year. The Class is so numerous that individual joinder of all members is impracticable.

47.     The Class is ascertainable either from Defendants' records or through self-identification in the claims process.

48.    Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, hereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

a.    Whether Defendants agreed not to solicit each other's employees;

b.    Whether Defendants exchanged competitively sensitive salary information and agreed upon compensation ranges for positions held by Class members;

c.    Whether such agreements were *per se* violations of the Sherman Act;

d.    Whether Defendants fraudulently concealed their conduct;

e.    Whether and the extent to which Defendants' conduct suppressed compensation below competitive levels;

f.    Whether Plaintiff and the other Class members suffered injury as a result of Defendants' agreements;

g.    Whether any such injury constitutes antitrust injury;

h.    The nature and scope of injunctive relief necessary to restore a competitive market; and

i.    The measure of damages suffered by Plaintiff and the Class.

49.    Plaintiff's claims are typical of the claims of the members of the Class as they arise out of the same course of conduct and the same legal theories, and they challenge Defendants' conduct with respect to the Class as a whole. Plaintiff will fairly and adequately protect the interests of the Class.

50.     Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

51.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

52.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

53.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

54.     Injunctive relief is appropriate with respect to the Class as a whole because Defendants have acted on grounds generally applicable to the Class.

## EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT

55.     Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful acts. Throughout most of the Class period and not until the

DOJ's settlement with Defendants became public on April 3, 2018, Plaintiff and Class members had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of due diligence, the existence of the Defendants' wrongdoing.

A.   **Defendants Took Affirmative Steps to Mislead Class Members and Conceal the Conspiracy.**

56.   Defendants took many active steps to conceal the conspiracy from Plaintiff and Class members. They guarded their conspiratorial communications to keep them from coming to light, and they affirmatively misled Plaintiff and the Class as to what they did to retain or find employees. They made these misstatements in a variety of forms, including direct communications with Class members, codes of business conduct issued to Class members, and even public filings with regulatory bodies such as the Securities and Exchange Commission (the "SEC"). Specifically, as part of Wabtec's 2017 Form 10–K, filed with the SEC, Wabtec listed Knorr as its "main competitor" while reporting to shareholders that management "recognizes its responsibility for conducting the Company's affairs according to the highest standards" including conducting "its business activities within the laws of host countries in which the Company operates."[27] Similarly, Knorr's Code of Conduct applied "to all employees of the Knorr-Bremse Group worldwide" and expressly expected "the entire workforce not only to observe internal regulations but also to observe the law."[28]

---

[27] *See Form 10-K Westinghouse Air Brake Technologies Corporation*, UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Dec. 31, 2017, *available at* https://www.sec.gov/Archives/edgar/data/943452/000162828018002245/wab1231201710k.htm (viewed Apr. 22, 2018).

[28] *See* Code of Conduct, KNORR-BREMSE, *available at* http://www.knorr-bremse.com/media/documents/group/compliance_1/02_KB_Code_of_Conduct_English_November_2012.pdf (viewed Apr. 22, 2018) at 1.

57.     Despite these public statements, behind closed doors, Defendants engaged in discrete agreements that would not have put Plaintiff or the Class on inquiry notice that there was a conspiracy to restrict competition for Class members' services through anti-solicitation agreements and to fix the compensation of Class members. Defendants' conspiracy was concealed and carried out in a manner specifically designed to avoid detection. Defendants relied on non-public methods of communication in order to prevent dissemination of the conspiracy beyond the individuals involved in the execution of the unlawful agreements. As discussed above, Defendants' discussions often occurred through direct conversations with each other's senior executives or through email exchanges between senior executives and/or recruiters, information to which Class members were not privy.

58.     Upon information and belief, to actively cover up their conspiracy and prevent Plaintiff and Class members from learning that their compensation was suppressed through collusion, Defendants routinely provided pre-textual, incomplete, or materially false and misleading explanations for compensation decisions and recruiting and retention practices affected by the conspiracy.

**B.      Plaintiff and Class Members Lacked Actual or Constructive Knowledge of the Conspiracy during the Class Period.**

59.     Because of Defendants' concealment efforts described above, Class members had no reason to know Defendants had conspired to suppress compensation until April 3, 2018, when the DOJ announced it had charged Defendants with a *per se* violation of the Sherman Act in connection with their no-poaching agreements and settled with them.

60.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

## CLAIM FOR RELIEF
### For Violation of Sections 1 and 3 of the Sherman Act
### (15 U.S.C. § 1, 3)

61.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

62.    Defendants, by and through their officers, directors, employees, or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of 15 U.S.C. §§ 1, 3. Specifically, Defendants agreed to restrict competition for Class members' services through refraining from solicitation of each other's employees, thereby fixing the compensation ranges of Class members, all with the purpose and effect of suppressing Class members' compensation and restraining competition in the market for Class members' services.

63.    Defendants' conspiracy injured Plaintiff and other Class members by lowering their compensation and depriving them of free and fair competition in the market for their services.

64.    Defendants' conspiracy is a *per se* violation of Sections 1 and 3 of the Sherman Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, prays for relief and judgment as follows:

A.    For an order certifying this lawsuit as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B.    For a judgment awarding Plaintiff and the Class treble damages, as well as punitive or exemplary damages, against Defendants for their violations of the Sherman Act, together with pre-judgment and post-judgment interest at the maximum rate allowable by law or allowed in equity;

C.      An order imposing a permanent injunction prohibiting Defendants from hereafter agreeing not to solicit other companies' employees, to notify each other of offers extended to potential hires, or not to make counteroffers, or engaging in unlawful communications regarding compensation and agreeing with other companies about compensation ranges or any other terms of employment;

D.      For an order awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.

Dated: July 13, 2018                          By: _s/ Joel R. Hurt_____
                                                   Joel R. Hurt, Esquire
                                                   PA ID No.: 85841

                                               Ruairi McDonnell, Esquire
                                               PA ID No: 316998
                                               **Feinstein Doyle Payne & Kravec, LLC**
                                               429 Fourth Avenue, Suite 1300
                                               Pittsburgh, PA 15219
                                               Tel.: (412) 281-8400
                                               Fax: (412) 281-1007
                                               _jhurt@fdpklaw.com_

                                               Craig L. Briskin, Esquire
                                               **MEHRI & SKALET, PLLC**
                                               1250 Connecticut Ave. N.W.
                                               Suite 300
                                               Washington, DC  20036
                                               Tel.: (202) 822-5100
                                               Fax: (202) 822-4997
                                               _cbriskin@findjustic.com_

Samuel J. Strauss, Esquire
**TURKE & STRAUSS, LLP**
613 Williamson Street, Suite 201
Madison, WI  53703
Tel:  (608) 237-1775
Fax: (608) 509-4423
*sam@turkestrauss.com*